Welles v. Turner Entertainment. Counsel ready? Yes. You may proceed. Good morning, Your Honor. My name is Stephen Ames Brown. I am the attorney for Beatrice Welles, the daughter and sole heir of Orson Welles and the sole successor in interest to Mercury Productions. I'd like to reserve about half of my time for rebuttal, if that's acceptable to the Court. Fine. We've been waiting patiently for the Applees to tell us what they think two critical passages mean. Both passages speak to the essence of the dispute, which are what rights did RKO retain what rights did they receive and what rights did they retain to exploit a motion picture based on Mercury's original story, which was Citizen Kane. And the first passage is in the 1939 production agreement between Mercury Productions and RKO, and it's the grant in the rights in pictures that are based on Mercury's original stories. And we know this grant is crucial because the Applees have told us so in their brief. On page 6, they wrote something which I think is quite significant. Quote, RKO could not exploit the motion picture without infringing the screenplay unless the motion picture and television rights in the screenplay were licensed to RKO. And we agree with the Applees that their rights are controlled by that sentence. The problem is, because it's an affirmative grant of rights, the problem is, is that motion picture and television rights are not defined in that provision, in that subparagraph, which is the fifth subparagraph of paragraph 13. Now, the sentence is actually quite simple, but it's quite profound in terms of its significance. It reads, quote, in the case of any original story written by the producer or any of its employees and used as the basis of either picture, however, the distributor shall acquire the motion picture and television rights in such story for such picture only. That's an affirmative grant of rights, and we've been waiting patiently for the Applees to tell us what they think it means. Now, we have to know what those words mean in order to interpret the contract. If one attempts to interpret what rights were given by Mercury to RKO in the 1939 production agreement before we know what our motion picture and television rights, then we're engaging in impermissible guesswork. And that's precisely what happened below. Now, jurisdiction was based on diversity, and there are two California statutes which specifically say that extrinsic evidence is admissible to prove trade meaning, CCP 1856C and 1861. And appellate. Yes, I'm sorry. The next two sentences in some way describe what you say was not left vague? No. No? I don't think they do. Let me hold to it so I can. RKO shall not remake any such picture unless Mercury, I'm putting in the name, you know, names, produces or redirects the same and unless RKO buys the remake rights. So in other words, if Turner Entertainment now wanted to make a new Citizen Kane, they couldn't do it. Well, that's true, but those are separate sentences and they refer to two totally different things. One is a reservation of rights and one is a grant of rights. And we do not know what that grant of rights means. Now, if we turn the clock back to 1939, we'd know from the culture what it meant, but we wouldn't know from the text of the agreement. Motion picture and television rights, they are undefined. If motion picture and television rights had been defined, for instance, supposing it said, you may exhibit it on television and in motion picture theaters, but you may not distribute copies to the public on home use devices, that would have been helpful if it had said that because that's what the expression meant in those days. But what they didn't do is they didn't define it. And you cannot in summary judgment simply make up a meaning because it appears more persuasive. I agree that one could listen to their position and come to that conclusion, but you could also read the sentence differently. That's why summary judgment was the wrong place to make that determination. Tell us specifically, why was summary judgment incorrect in your view on this record? Well, certainly. As succinctly as you can do it. I will. Actually, there are two different contracts, both of which were misconstrued, one of which was ambiguous, the other of which was not, but simply not interpreted at all. The 1939 agreement had a grant of rights and told them that they had motion picture and television rights. And nowhere in that paragraph, that subparagraph, are motion picture and television rights defined. It was error to simply pick a meaning because it's the one you like. You don't do that in summary judgment. The second thing that was wrong was the 1944 agreement, that's the exit agreement, RKO gave up its rights. Well, the only rights it had to give up was the right to exploit the motion picture Citizen Kane and had no other rights. The services had already been delivered. There was nothing else to do except on the one side for them to exploit the picture and then to account. But in terms of RKO's rights, the only right they had was the right to that motion picture. They gave up that right. When they gave up that right, it wasn't theirs anymore. And the Court simply ducked the issue. Now, there's a second reason why the summary judgment was incorrect with respect to the second contract. If you have two contracts between two parties covering the same subject matter such that the two are inconsistent and cannot stand together, the latter contract operates as rescission of the former contract. That was the law in 1944 in New York. That was the common law. That's the Housekeeper case, which was the Housekeeper case, which interpreted New York law, although it was an Eighth Circuit case. Housekeeper has been approved and cited in subsequent New York cases. It's the law of the Eighth Circuit. It's the law of the Sixth Circuit. And this circuit said it's the Federal common law quite clearly. So the mistake that was made, three, one, the 1939 agreement, the contract is ambiguous on its face, and to simply say, well, we think we can guess at what it means by looking at what's surrounding it, you don't do that on summary judgment, especially when you are – when in California there are two statutes that say that you can tender admissible – excuse me, extrinsic evidence of trade usage. That's what we did. And that evidence creates an issue of fact wholly aside from whether or not the language itself was ambiguous, because in California, you procedurally have the right to – to – to proffer the evidence. It must be conditionally received and evaluated to see if the proffered meaning is consistent with that evidence. And if it is, if the evidence is otherwise proper in form, it must be admissible. So whether it's ambiguous or not, there is a question of fact by virtue of the expert declarations. I think in the initial instance, it was ambiguous as a matter of law and with respect to law. And what's the question of fact specifically? What do the words – what in 1939 do the words motion picture and television rights mean? They're not defined. And they have to have a meaning. You can't just strike them from the contract, which is what the Appellees have done. In fact, if you look at the Appellees' brief on page 6 – I'm sorry, not page 6. I believe it was on page 23. When they discuss this provision, they truncate the sentence, because the grant of rights begins with the word however. Now, when however is used in the conjunctive, it means notwithstanding. It means what follows supersedes or limits what precedes it. And when they discuss that sentence, they just take that word out, and the word however has three little dots there. They don't even discuss it. So as a matter of grammar, as a matter of contractual interpretation, that grant of rights provision has to have a meaning. It cannot be discarded. We don't know what it means. Summary judgment was wrong. That's the first instance. The second was the 1944 agreement. RKO gave up its rights. I have yet to hear the Appellees explain why, when they gave up their rights, why the only right they had for Citizen King, which was the right to exploit the picture, was not the right they were giving up. They never discussed it. The court below never discussed it. And then, of course, you have the common law issue, which is what happens when you enter, when you have a second contract which completely displaces the first contract. What's the legal effect? Now, I've seen the cases they cited. Those are California cases, and those cases refer to what happens when there's a termination provision in a contract. What happens if you exercise that termination provision? That's not what we're discussing here. We're discussing when the same parties enter into two different contracts at two different times on the same subject matter, such that the two cannot stand together. And as a matter of common law and the law of New York, the latter rescinds the former. And the latter is the only contract between the two. That being the case, RKO had no rights, assuming they hadn't given them up by virtue of the express language in the contract. Are you suggesting this entire case is to be governed by New York law? I am suggesting that you cannot interpret the 1939 production agreement without the application of New York law because it requires it. That's number one. Number two, I'm sorry, I'm trying to directly address your question. Number two, I think that if you use the governmental interest analysis, New York ends up being the chosen law anyway. These were New York residents. The contract went on for a period of 56 years, which is the life of copyright. Hollywood was only involved for two years for the production of the picture. So if you have two New York residents, a contract that is governed for all purposes by New York law, the fact that the 1944 agreement doesn't have a choice of law provision I don't think changes the analysis. I don't see how California would apply California law. And if you applied California law, you still end up with the same result because there is the California cases that they've cited don't stand for the proposition that we put forward. I don't see how New York law is escaped. And I certainly don't see how you can determine what's left of a New York contract that has a mandatory New York law choice of law provision if you don't use New York law. And I'll tell you, I can't find any California cases which contradict the common law. And if you look back, and here's why I think this is so impalatable to the Court below. We're in the 21st century. And the result just seemed just a little draconian. But that was the law in 1944. The law in 1944 in most jurisdictions was contributory negligence. A horrifically injured plaintiff who was 1% negligent was barred from recovery. That was the law in most jurisdictions. We didn't have comparative negligence until decades later. In 1944, people knew what happened when you entered into a second contract. The law was clear. The Black Treatise was there. Housekeeper was there. The Renard case, the New York case, all those cases decided they knew what it was. The fact that sitting here today it's not the result we would like under the way we look at law now really isn't the question. Mr. Brown, what would – what in your view would be the bottom line of the decision of this Court on this case as it's now postured? It was air to enter summary judgment on a contract which is ambiguous on its face, even if it was not ambiguous on its face. Extrinsic evidence raised, which is admissible to show trade usage, raised a triable issue of fact. And with respect to the 1944 contract, RKO clearly gave up its rights in the picture because that's what the contract says, and if not, then the second contract superseded the first and rescinded it as a matter of law. The error for summary judgment remanded for further proceeding is not inconsistent with your learned opinion. How many copyrights are we talking about in this case as you view it? Copyright is a bundle of rights. It's an interesting concept because it's – it's intangible, and it's an often misunderstood concept. A registration of a photo play covers all the elements in it, so the music, the to some extent to the costuming. Those are all copyrightable elements, and they all are part of a bundle of copyrights which are protected by the photo play. Is that such a thing in this case? Are we looking at a screenplay and a motion picture as two distinct entities? For the purposes of the bundle of copyrights, that would be true. And I'll give you an example. If somebody created another motion picture, not using any of the photography or any of the sound, but capturing new people saying the lines of the original picture, that would violate the copyright in the motion picture in the photo play because the script is a copyrightable element. That script, according to the contract, was owned by Mercury. We know ultimately now that Beatrice Wells owns it because the Apple East so kindly gave us a quick claim which was recorded and, as we put before you, with a request for judicial notice. It is protected, and the law has always been the same, and I'll explain to you why it can't be otherwise. Because if the copyright did not protect the entirety of the photo play, including all of the elements of the photo play, then if somebody reproduced the music of the photo play, it wouldn't be an act of infringement. It's only an act of infringement because the music is a copyrightable element that's included. Except here we have contracts that told us who owned what, and of course we also have a quick claim from the last registered owner. We know who the author is. It's Mercury because both copyright registrations said so. That's what was required under the 1909 Act, which is that all copyrights be registered and renewed, not in the name of the claimant, in the name of the author. And everybody agreed the author was Mercury Productions because that's who RKO put on the registration certificates on the original and on the renewal registration. Have I answered your question? I'm sorry. Roberts. Yeah. I just want to mention you asked for a, you know, some rebuttal time. Oh, yes. I'm going to stop right now. I just saw what time it is, unless you have further questions. Thank you so much, Your Honor, for the prompt. I appreciate it. Like most lawyers, I would have prattled endlessly. Thank you. May it please the Court. I'm David Quinto of Quinn Emanuel Urquhart Oliver and Hedges for Appelese. Your Honors, as I listen to Appellant's argument, it strikes me that implicit in that argument is the notion that for the last 40 years of his life Orson Welles didn't realize that he owned the copyright in his greatest work. Certainly, it was called to his attention, as Appellant has pointed out, he entered into joint licenses with RKO, pursuant to which the screenplay rights were licensed. I do agree with Appellant, though, that the case can be decided based on the operative agreements. At first, we begin with the producer agreement, beginning at page 40 of the excerpts of record, which says the distributor or RKO shall own the negative and positive and all parts thereof and all material, tangible and intangible, used therein, as soon as such rights come into existence, including but not limited to the exclusive rights of distribution, exploitation, manufacture, recordation, broadcasting, televising, other than in connection with advertising or exploitation of a commercial product or service, and reproduction by any art or method, and the literary, dramatic, musical, and other works included in such picture. And I'll stop there for a moment and point out that the phrase that the distributor or RKO would own all rights as soon as such rights came into existence made the work a work for hire. Thus, the copyright was owned by RKO at all times. From the first instance, there was no assignment. Thus, the argument that the 1944 agreement somehow rescinded a right related to the ownership of the copyright misses the mark. The copyright was at all times property of RKO and further was not subject to any reversionary right under the Copyright Act. As Your Honors know, Sections 203 and 304A of the Copyright Act provided, of the 76 Act, provide for reversion to an author if there has been an assignment. But this was not an assignment. It was a work for hire under the 1909 Act. Further, the portion that we've looked at so far specifically conveyed the distribution right to RKO and also the right of reproduction by any art or method. Although in 1939 people did not yet specifically anticipate the development of home video, this grant of rights would, of course, include home video and is quite different from the grant of rights in Cohen v. Paramount, which makes appellant's reliance on that case inapplicable. What do we look to when we decide whether to affirm or reverse and remand for further proceedings? Well, I think you look to two things, Your Honor. First, you look at the language of the agreements, and I think the agreements are quite clear. I don't think there is any term that's ambiguous that requires expert explanation. The contracts can be interpreted and, indeed, were correctly interpreted by the district court. Secondly, you look at the intent of the parties. And it seems to me pretty clear from the 40-year course of dealing between Orson Wells and RKO following the 1944 agreement that they understood that the copyright was in RKO and further understood that there were no royalty rights left by virtue of the 44 agreement. You know, Mr. DeGioia, you will have to tell us. Now is the time to do it. It appears, though, from looking, that there may have been something that the parties didn't anticipate, and that is home video. It came along, and we then looked back to see what had they anticipated? What did they agree upon? And in what way does that embrace or affect home video? Because home video wasn't just something that was snatched out of the air. So we looked back. Now are there two copyrights that we're looking at or is there just one? Appellant's counsel is not quite accurate. There is one copyright in the photo play or motion picture. Appellant's counsel argues that that covers the screen play. It does not. There is a substantial overlap between the two. Let's assume in total agreement that they're the two. There's one for the screen right and one, as you say. Well, then, what do we look to to see where does the home video work into this equation? Oh, well, that's easy. The home video is simply the motion picture in a different form. It is the motion picture. Everything in the motion picture is embodied in the home video. The home video is simply a means of exhibiting the motion picture on a home television. So it's that copyright. It's the RKO copyright. To address Your Honor's question, it's commonplace that there may be new technologies developed down the road and parties anticipate them in contracts, even though they do not know what those specific new technologies may be, by the use of the very language that we have here. In the portion that I've read, which is actually on page 41 of the excerpts of record, the portion of the 1939 Producers Agreement, it allows RKO the right to reproduce by any art or method the motion picture. That is the language. That is the catch-all phrase that covers home video and any other technology that maybe we don't even anticipate today. Are we looking at New York or at California law on the contract? I'm not sure that it makes a difference. I think the result is the same either way. The 1939 agreement does contain a New York choice of law provision. The real dispute about whose law applied was a dispute arising out of the 1944 agreement, which did not contain any choice of law provision. However, I would note that the contract was performed in California. The complaint alleges that the royalties should have escheated to the State of California. There was substantial involvement of California, including, of course, that the complaint was filed here. Judge Duffy made a point when my colleague, Mr. Brown, was arguing that one had to look at the two sentences following the sentence at the top of page 43 of the 1939 Producers Agreement. Mr. Brown never got to that sentence. That sentence says, the producer, that is Mercury, shall own the publication, radiodramatic, and other rights in any such story, but shall not use the same in any way to compete with or injure the distribution of the picture based on such story. I think it's quite clear from that sentence that what the parties were saying was that, sure, Wells could have the screenplay rights, but he wasn't to do anything that would interfere with the right of RKO to distribute the picture. And I note again, this is in contradistinction to the Cohen case, where there was no right of distribution involved. Distribution is one of the specific rights in the bundle of copyrights that Mr. Brown referred to. It's called out by statute. The home video, of course, is a means of distributing the motion picture. Well, it can be argued that it is a means of distributing. What about television rights? Who owned them? Well, the – again, this is – Can you look at the agreement and see, say, who owned the television rights? Didn't RKO own them? Yes. At the top of page – So that shows that there was some distinction. Wasn't there some distinction made by the parties at the time? I don't think so, Your Honor. I think that what's going on here is this is a permissive grant. Wells is saying, I recognize that you have the right to do anything you want with the motion picture. And to that end, I will specifically acknowledge that you've got the motion picture and television rights. And because we don't know yet what future technology may bring, I will include a catch-all provision saying I won't do anything to compete with or injure your distribution of the motion picture. So I think that catch-all phrase dovetails very nicely with the very broad grant that we saw at page 40 of the excerpts of records. Is there, in your view, no ambiguity as to whether the contract granted RKO all the rights, the home video rights in the screenplay? I don't see any ambiguity, Your Honor. Further, I don't see any dispute in the evidence. The facts are what they are. This is an agreement that was entered into 68 years ago. I think the district court was quite right in saying that during the oral argument on the motion, the questions of contract interpretation are for the court, and I think the district court nailed the interpretation. Yes, but does it make any difference that the court didn't introduce expert testimony as to what motion picture meant at the time? I think the court denied it, didn't it? It didn't introduce it. It didn't consider it. Isn't that so? Well, the court did not address it in its opinion grant and summary judgment, but I don't think it makes any difference. I don't think there's any issue concerning what those terms meant or how they were understood at the time because the district court said, Look, this is an enabling provision. It's a permissive grant. It's to allow RKO to exploit the movie, and we immediately after that have that catch-all. We will do nothing to interfere with or injure the right of distribution. Yes, but I understand, and as good counsel, you have to argue as you're doing, and I'm not suggesting that there's anything wrong with it. But if there was a definition that was understood by both parties at the time, wouldn't it be relevant when the court now is faced with motion for summary judgment? I don't think so. I mean, at the time, parties understood television to be black and white, small screen, poor quality. Now we understand television to include color, cable, satellite, flat screen, big screen, high def. And more to come in the future, so they keep telling us. Sure. All right. But the fact that those were not contemplated in 1939 wouldn't narrow the scope of rights under the contract. I mean, I don't think you could say, well, clearly the parties intended that Citizen King would be broadcast only on black and white to people who own Sylvania or RCA sets and wouldn't go out on cable or satellite. Sure, you can make it as ridiculous as you want, but you might read an opinion that would clarify something that you think is ridiculous. So that's why I'm giving you the opportunity now to tell us what you want to tell us. There was no doubt that there was expert testimony on what motion picture meant at the time. That's the term that was used in the contract at the time. And as I understand Mr. Brown's argument, he's saying that is significant. The Court didn't consider it, as you've admitted. And I don't mean you've given up anything. I don't know how you could deny it. It's pretty clear the Court didn't. There was an expert. There was expert testimony. The Court didn't consider it. Now, on this record, shouldn't the Court have considered it? No, Your Honor, because the Court didn't. Well, you may want to tell us in cogent language. If you want to tell us sort of to ridicule it, you can do it. But you want to win, and that's not going to win it for you. Well, I don't mean to sabotage my client's case, Your Honor, but it seems to me clear that what we're looking at in that second passage is a permissive grant. It's not a restriction. It's a permissive grant. And it's intended, as stated in the last sentence of the paragraph at the top of page 43, that nothing is intended to be applied to compete with or injure the distribution of the picture. So what the parties were saying and what the district judge concluded is that there is a specific grant of motion picture and television rights, because in 1939, people could say what motion picture and television rights were, but then there's this catch-all provision, this saving provision, saying we're not going to compete with your right of distribution, distribution being one of the specific rights granted to RKO. Yes, but if there was a copyright to the screenplay, as you recognize, and if there was a copyright to the motion picture, as you have recognized, then the person who was going to distribute in a movie theater, which is what was anticipated, would have both in order to do so. Now we're looking to see does that, what embraces home video? And there's a question, there's a suggestion that the definition of motion picture at the time would have some bearing on our finding that answer. The broad grant at the beginning specifically covers reproduction by any art or method and the distribution rights. When you show a picture in a motion picture you're in in a theater, you're exhibiting it. When you give, when you sell copies to the public, that's a distribution. Those are separate concepts, and what this is allowing is the distribution of the picture. There was nothing here that was intended to restrict that right. Okay, now maybe it's simplistic, but as I understood the contract, the movie, the motion picture could be distributed through any medium. So would a home video be a medium for distribution? I think it would, Your Honor. Again, we have to go back and we look at the language on page 41 that allows reproduction by any art or method. Clearly the making of a DVD is reproduction by an art or method. The distribution right doesn't limit in any way the means or the method in which the material is distributed. Ordinarily one distributes copies. Copies can be in various forms. Could you briefly address an issue not covered on the possible post-1944 agreement? Sure. Judge Farris was asking counsel on a prior matter this morning about the record before the district court. Here what was before the district court was, of course, the Second Amended complaint, which doesn't make any allegation about a hypothetical post-1944 agreement. The complaint simply sought declaratory relief that the rights arose under the 1944 agreement. So the complaint never raised that point. That point was raised for the first time on appeal. But the complaint never said there was a later agreement? No, Your Honor. It sought a declaration of rights under the 1944 agreement. And, again, the facts are what they are. There is no new evidence that would come in at trial. I don't think anybody located a living witness from 1944. What we have is simply a question of interpretation of documents. Counsel, some of us were alive in 1944. Go ahead. I appreciate that, Judge Duffy. I appreciate it, too. I appreciate more being alive still. What I meant was we've been unable to find anybody involved with the facts giving rise to this dispute in 1944. I have nothing further that I would argue. It's a good thing you don't, because you've passed your time. I still have some. I don't. I apologize. I thank the Court for its consideration. I thought you were coming to a close, and that's why I would let you do it. But when you added I don't have anything, I thought maybe I'd better point out to you that it's a good thing you don't. Go ahead. Thank you very much, Your Honor. I would refer to the court, to the excerpts of the record of page 141, and you will see that, most specifically, we allege the existence of a subsequent agreement. It says the controversy has arisen, on and on and on, or the parties subsequently entered into a new agreement to share their rights and income. That was the subject of 131? 141, please. I'm sorry. Mr. Brown. Yes. What has been already argued and what has been repeated here. Yes. He's limiting it to two things. Distribution, as I understand it, I don't know that he's limiting it to it, but he talks about distribution, and he's saying that there was a broad agreement regarding distribution. And he's saying there was a broad agreement regarding the motion picture. And he sees, as I understand it, the home video is really showing the motion picture and exporting the motion picture and distributing it. Well, I would say this. Throughout their brief and throughout oral argument, they keep changing the subject on you. Well, they ought to. They won. They won once before, and they want to win again. That's true. Yes, but they dance a little bit. That's right. And that is what they're doing, but I'd like to bring it up. Well, counsel is accustomed to that. I'm not saying there's anything wrong with that. Counsel isn't. We are. I'm just suggesting, however, that it misses the point. The fifth subparagraph of paragraph 13 tells you that there's something special about based on original stories that were authored by Mercury. And it says you get motion picture and television rights. That's a specific grant that restricts or supersedes the general grant. It has some impact on the general grant. And what they're telling you to do is strike it out of the contract. All right, let's assume it's still there. Then what? Where does home video come in? Home video is not among the motion picture and television rights that were granted in 1939. That was my initial point. And this was not a work made for hire because a corporation can't be an employee under the 1909 Act. Yeah, but you've been around long enough to know why people did it. They did it for income tax reasons. I agree. A lot of times they do. I agree. And I thought you did. Yes, but it has significance. And there are loan out corporations to this day, but the point is what they got was an assignment. They didn't have a work made for hire. If they had a work made for hire, they wouldn't have needed all that grant of rights language. They're telling you that none of that grant of rights language matters. What saves you and what causes us to deny the motion of summary judgment as briefly and succinctly as you can tell us? There is a grant that tells you quite specifically what happens if the motion picture is based on an original story. It tells you that the rights are motion picture and television rights. That phrase is ambiguous on its face. And if it's not ambiguous, we still are entitled to put in the evidence. The court had it below. It was not excluded from evidence. It wasn't properly considered. There's no possible way you can interpret this contract without engaging in a popularity contest. I like your reasoning more than your reasoning. You don't do that on summary judgment. And that's all I heard today was my theory is more popular than yours. Well, we may have heard more than that. But the question is, and that's what you want to tell us. Yes. Something was excluded which has bearing. And we alluded to it. Yes. And you need to tell us why that skewed the result in this case. Because if you considered, if the court had considered the expert testimony, the court would have realized that the specific grant that tells you what happens if the motion picture is based upon an original story, you would realize that they had no right to distribute that motion picture on home devices sold to the public. That's what was wrong. That's what the 39 contract. He still hasn't told us under the 44 contract when they gave up their rights under the 39 contract why that motion picture wasn't a right they gave up by the express terms of the contract. He just says, well, the parties didn't act that way afterwards. Well, yes, they did, because they seemed to have pooled their rights together starting in 1948. It's pretty clear that the reason the court granted Summers judgment was because he decided, I think, that home video was merely exploiting the motion picture. And the problem is it's because he thought that the he did not look at paragraph the fifth subparagraph of 13 and understand its significance. Its significance is, is it qualified the general grant? That general grant does not apply if the motion picture is based on an original story. It says so. It tells you what it's about. It says, however, and quite directly tells you what rights they're granted. And in any event, we don't know specifically what it means, in which case it was aired to grant summary judgment. This is not a popularity contest. You have to figure out not which one sounds more persuasive. You have to find out whether there's a dispute. There clearly is a dispute. Summary judgment was wrong. And in any event, the post-forty. Kennedy. And the extent of the dispute would have been clear, you think, if the Court had permitted the, had considered at least the expert testimony. Yes, it would have been decisive on that issue. It still would have addressed the issue which we raised, which is what about the subsequent agreement to share the copyright based on the contracts from the 60s when they started licensing the rights as joint owners? That has some significance. It was completely ignored by the Court below. What would be the language of the remand? You got a second or so. Go ahead. Go ahead. Reversed with instructions for further proceedings not inconsistent with his opinion. And that's about as close to nothing as a court can ever say. I know. I know. And that's why we almost never do it. I understand that. It was air for the Court below to not consider this evidence and ignore the plain meaning of the 1944 contract. Thank you, counsel. The case just argued is submitted. The Court for this session stands adjourned. Thank you, Your Honor. I forgot to ask Judge Gould, did he have another question before we terminated? Thank you. No. Thank you. Thank you. Thank you, Your Honor. But we said stands. The Court for this session stands adjourned.
judges: Farris, Gould, Cff, Duffy